IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROGER B. WEIMER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-cv-351 |
| v. | ) | |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

CONTI, District Judge

*Introduction*

This is an appeal from the final decision of the Commissioner of Social Security ("Commissioner or "defendant") denying the claim of Roger B. Weimer ("plaintiff") for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-83f. Plaintiff contends that the decision of the administrative law judge (the "ALJ") that he is not disabled, and therefore not entitled to benefits, should be reversed because the decision is not supported by substantial evidence. Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Summary judgment for neither party shall be granted, and the case will be remanded for the ALJ to explain what weight should be given to the opinion of plaintiff's treating physician.

*Procedural History*

On October 10, 1989, plaintiff, who was then twenty-seven years old, protectively applied for SSI benefits alleging that he was disabled due to trauma from a gunshot wound to the head. (R. at 63-66.) On March 12, 1990, the Commissioner found plaintiff disabled due to a gunshot wound to the head causing brain damage. (R. at 67.) His condition was determined to equal "the intent of Listing 12.05C." (R. at 69.) Plaintiff was then awarded SSI benefits beginning October 1, 1989. (Id.)

The Commissioner reviewed plaintiff's case on March 31, 2004, to determine if he was still disabled. (R. at 69-72.) The state agency found that plaintiff was no longer disabled as of March 2004 (R. at 68.) Plaintiff requested reconsideration of that decision (R. at 73-75), and a disability hearing officer upheld the determination on reconsideration. (R. at 76-95.) Plaintiff requested a hearing before an administrative law judge. (R. at 98.) The hearing request was dismissed because plaintiff failed to appear for his hearing on January 19, 2006. (R. at 420-27.) On March 31, 2006, the Appeals Council vacated the dismissal and remanded the case to the ALJ. (R. at 430-32.)

On remand, the ALJ held a hearing on December 5, 2006. (R. at 22-56.) Plaintiff was present at this hearing and represented by counsel. (R. at 22, 24-25.) A vocational expert ("VE") was also present and gave testimony. (R. at 22, 48-53.) On February 13, 2007, the ALJ decided that plaintiff's mental condition had improved and he no longer met or medically equaled Listing 12.05C. (R. at 9-21.) In addition, the ALJ decided that plaintiff did have the ability to perform a number of jobs in the local and national economies which would accommodate his functional limitations. (Id.) As a result, the ALJ concluded that plaintiff's alleged disability had ended on

March 1, 2004. (Id.) Plaintiff requested a review of the ALJ's February 2007 hearing decision (R. at 8) and was denied by the Appeals Council. (R. at 5-7.) Plaintiff filed the present action seeking judicial review of the ALJ's decision.

### *Plaintiff's Background and Medical Evidence*

Plaintiff was forty-five years old at the time of the December 5, 2006 administrative hearing. (R. at 48.) He had a general education diploma and no prior work experience. (*Id.*) He last received SSI benefits in May 2004 (R. at 71), but he continued to receive welfare benefits including cash, food stamps, and medical assistance. (R. at 43-44.)

The record shows that plaintiff sustained a self-inflicted gunshot wound to the head on September 13, 1989. (R. at 284.) As a result, he underwent a right temporal craniotomy with debridement. (Id.)[1]. The effects from plaintiff's head injury included brain damage (R. at 324), vision problems, and some gait and balance difficulties. (R. at 341.)

On December 31, 1989, Dr. Steven P. Kuric submitted a report regarding the plaintiff. (R. at 341-42.) Plaintiff seemed to be doing well but had a left visual field deficit due to the gunshot wound injury in addition to some gait and balance difficulties due to the central cord infarct.[2] (R. at 342.) He was also taking prophylactic Phenobarbital[3], which the doctor believed

---

[1]Craniotomy is "[a] surgical operation in which an opening is made in the skull." http://www.medterms.com/script/main/art.asp?articlekey=2861 (last visited Mar. 4, 2009). Debridement is "[t]he act of debriding (removing dead, contaminated, or adherent tissue or foreign material." http://www.medterms.com/script/main/art.asp?articlekey=40483 (last visited Mar. 4, 2009).

[2]Spinal cord infarction "usually results from ischemia originating in an extravertebral artery." http://www.merck.com/mmpe/sec16/ch224/ch224f.html (last visited Mar. 4, 2009). Symptoms include "sudden and severe back pain, bilateral flaccid limb weakness, and loss of

plaintiff would be taking for a long time and possibly his lifetime.  (R. at 341.)  Visual testing revealed that plaintiff had left homonymous hemianopsia.[4]  (Id.)  Dr. Kuric's final diagnosis was central spinal cord syndrome, secondary to spinal cord infarct with residual gait and co-ordination difficulties.[5]  (R. at 341-42.)

In December 1989 and January 1990 Dr. Peter Saxman conducted an assessment of plaintiff using the Wechsler Adult Intelligence Scale-Revised (WAIS-R), Wechsler Memory Scale, Bender Motor Gestalt Test, and the Trailmaking Test.  (R. at 321-22.)  Plaintiff's WAIS I.Q. scores were 88 (verbal), 60 (performance), and 74 (full scale). (R. at 322.)  His verbal I.Q. score fell in the low average range, performance I.Q. score fell in the mild range of mental retardation, and his full scale I.Q. score fell in the range of borderline mental deficiency.  (R. at 323.)  For the Wechsler Memory Scale, plaintiff scored an 89, which placed him in the low average range of memory functioning.  Plaintiff showed definite perceptual disturbances during the administration of the Bender Motor Gestalt Test; his performance suggested brain damage in

---

sensation, particularly pain and temperature."  Id.

[3]Phenobarbital is "a barbiturate, nonselective central nervous system depressant which is primarily used as a sedative hypnotic and also as an anticonvulsant in subhypnotic doses." http://www.rxlist.com/phenobarbital-drug.htm (last visited Mar. 4, 2009).  "The most common side effect is somnolence, or sleepiness."  http://www.rxlist.com/phenobarbital-drug.htm (last visited Mar. 4, 2009).

[4]Homonymous hemianopsia is "the loss of half of the field of view on the same side in both eyes."  http://www.eyeassociates.com/images/visual_field_impairment.htm (last visited Mar. 4, 2009).

[5]Central spinal cord syndrome is "an acute cervical spinal cord injury ... [that] is marked by a disproportionately greater impairment of motor function in the upper extremities than in the lower ones, as well as by bladder dysfunction and a variable amount of sensory loss below the level of injury."  http://emedicine.medscape.com/article/321907-overview (last visited Mar. 4, 2009)

the visual spatial areas. (Id.) Plaintiff's time score on the Trailmaking Test again suggested brain damage. (R. at 324.) The test measured the visual scanning ability of the test taker and the second part required mental flexibility in problem solving. (Id.) Plaintiff performed poorly on this test. (Id.)

Dr. Saxman concluded that plaintiff was clearly brain damaged with a pattern of deficits that suggested damage to the right temporal, parietal, and occipital lobes. (R. at 324.) He had defective abilities in perceptual and nonverbal reasoning with difficulty in concentration and attention. (Id.) The defective vision and poor problem solving abilities made it unlikely that plaintiff could work in any situation related to his previous employment at his father's tree nursery and other nurseries in the area. (Id.)

There is no indication in the record that plaintiff sought any further medical attention during the time between his 1990 examination by Dr. Saxman and his 2004 examination by Dr. Joel Last. On January 22, 2004, plaintiff saw Dr. Last for a disability evaluation at the request of the Pennsylvania Bureau of Disability Determination. Dr. Last's impression of plaintiff was alcohol abuse and dependency as well as dementia due to head trauma. (R. at 369.)

He opined that plaintiff had a Global Assessment of Functioning (GAF) score of 35 for the current and preceding years.[6] (*Id.*) Dr. Last also noted that plaintiff was capable of managing

---

[6]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. A GAF score of between 50-60 denotes moderate impairment. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: <u>Diagnostic and Statistical Manual of Mental Disorders</u> (<u>DSM-IV-TR</u>) 34 (4th ed. 2000); see <u>Lozada v. Barnhart</u>, 331 F.Supp.2d 325, 330 n.2 (E.D. Pa. 2004). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social,

his own finances, had some difficulty with work-related activities and difficulty with physical labor as well. (Id.)

Dr. Last noted that plaintiff's abilities to understand, remember, and carry out simple instructions were slightly restricted by his impairment. (R. at 370.) Plaintiff's abilities to understand, remember, and carry out detailed instructions and to make judgments on simple work-related decisions were moderately impaired by this impairment. (Id.) This assessment was supported by plaintiff's poor concentration. (Id.) Dr. Last opined that plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting were not affected by his impairment. (Id.) Lastly, he found that plaintiff had difficulty with ambulation and balance due to the impairment. (R. at 371.)

On February 13, 2004 plaintiff was seen by Dr. Kamal Rastogi for a Social Security Disability Evaluation. (R. at 363-67.) Dr. Rastogi opined that plaintiff had some brain damage and difficulty keeping his balance; however, plaintiff's balance improved as the evaluation progressed. (R. at 363.) His impression of plaintiff was memory impairment by history though plaintiff was able to give him "a good history regarding events since 1989" and left homonymous hemianopsia. (R. at 364.) Dr. Rastogi described homonymous hemianopsia as "when [plaintiff] closes his right eye, his visual field in the left eye is intact on the right half; however, left half, he is unable to see." (Id.) He suggested that plaintiff should follow up with an ophthalmologist

---

occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . . ." (*Id.*)

about the left homonymous hemianopsia, obtain a neuropsychological evaluation regarding the memory impairment and consult with an occupational and vocational rehabilitation professional to find a vocation. (R. at 365.) In his evaluation, Dr. Rastogi found no limitations with lifting, standing and walking, sitting, pushing and pulling, and postural activities. (R. at 366.) The only physical limitation he found was plaintiff's sight due to the left homonymous hemianopsia. (R. at 367.)

On July 14, 2004 plaintiff was admitted to Westmoreland Regional Hospital for chest pain. (R. at 398-01.) Dr. Daniel M. O'Roark was the attending physician. He found that plaintiff's electrocardiogram was normal. (R. at 396) and chest x-ray was normal. (R. at 401.) Dr. O'Roark diagnosed atypical chest pain (R. at 399) and indicated no further cardiac testing was needed. (R. at 397.)

On February 13, 2006, the plaintiff's primary care physician since December 2005 (R. at 36, 42), Dr. Alan L. McGaughran,[7] completed an Employability Assessment Form for the Pennsylvania Department of Public Welfare. (R. at 442-43.) Dr. McGaughran opined that plaintiff was permanently disabled with a primary diagnosis of spinal cord injury with partial quadriplegia and secondary diagnosis of chronic neck pain, chronic low back pain and chronic tinnitus.[8] His diagnosis was based on a physical examination and clinical history. (R. at 443.)

At the administrative hearing on December 5, 2006, plaintiff claimed he was able to carry an average bag of groceries or a maximum amount of weight no greater than 20 or 30 pounds for

---

[7]In the transcript of the hearing before the ALJ, the doctor was referred to as " Dr. Alan McLaughlin." (R. at 36.)

[8]Tinnitus is "a ringing, swishing, or other type of noise that seems to originate in the ear or head." http://www.medicinenet.com/tinnitus/article.htm (last visited Mar. 4, 2009).

only a time span of minutes. (R. at 32-33.) He also claimed balance difficulties which resulted in a DUI conviction. (R. at 33.) Plaintiff's daily activities included light cleaning, cooking, and lifting his five-year-old son for short amounts of time. (R. at 34-35.) He was able to concentrate on the written word but had trouble with the spoken word. (R. at 35.)

He was taking two medications at the time of the hearing: 1,200 milligrams of Neurontin[9] and ten milligrams of Flexeril.[10] (R. at 35.) Plaintiff explained to the ALJ that he was prescribed Neurontin by his primary care physician, Dr. Alan McGaughran; he also stated that he had been seeing Dr. McGaughran for over a year. (R. at 36.) Plaintiff claimed to have pain in his neck, lower back, and at times in his hip and feet. He felt a burning sensation, numbness, and weakness. (R. at 37.) Plaintiff stated that on a scale of one to ten on an average day the pain in his neck and lower back was at level ten. (R. at 38.)

Plaintiff claimed to suffer from tinnitus every day and had difficulty trying to sleep. He also experienced severe pain from his neck that went up behind his ear and into his scalp. (R. at 40-41.) Plaintiff was unable to say how long he was able to sit in a chair without interruption or a need to move around. He did claim to be in pain while sitting at the hearing and that the pain was located in his lower back and neck. (R. at 41.) Plaintiff was questioned by his attorney regarding

---

[9]Neurontin is used for the management of neuralgia and epilepsy. http://www.rxlist.com/neurontin-drug.htm. Side effects include dizziness, somnolence, and peripheral edema. *Id.*

[10]Flexeril is "a muscle relaxant ... [that] works by blocking nerve impulses (or pain sensations) that are sent to [the] brain." http://www.drugs.com/mtm/flexeril.html. Side effects include drowsiness, dry mouth, fatigue, headache, abdominal pain, acid regurgitation, constipation, diarrhea, dizziness, nausea, irritability, mental acuity decreased, nervousness, upper respiratory infection, and pharyngitis. http://www.rxlist.com/flexeril-drug.htm.`

how long he was able to stand outside his residence; plaintiff answered that he did not know, "[m]aybe a half an hour." (R. at 42.) Plaintiff stated that he was able to do ten to fifteen minutes of light housework. (Id.)

The ALJ posed a hypothetical for the VE. The ALJ asked whether there were jobs for a hypothetical individual of the same age, education, and work experience as plaintiff with a limitation of no more than the heavy range of exertion; avoidance of ropes, ladders, and scaffolds; and avoidance of balancing maneuvers and unprotected heights. (R. at 48-49.) This hypothetical individual would need an occupation which did not require left peripheral vision acuity and would be limited to simple and routine tasks and simple work-related decisions. (*Id.*) The VE responded that there were over a thousand heavy jobs available in the local economy that a person of the hypothetical situation could perform as well as over one hundred thousand heavy jobs in the national economy as a landscape laborer. (R. at 49.) Other jobs in the heavy, medium, and light range that the hypothetical person could perform included lumber handler, kitchen helper, industrial cleaner, vending machine attendant, and electrical equipment assembler. (R. at 49-50.)

### *Legal Standard*

Judicial review of the Commissioner's denial of a claimant's benefits is proper pursuant to 42 U.S.C. § 405(g). This court must determine whether there is substantial evidence which supports the findings of the Commissioner. 42 U.S.C. § 405(g). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co v. NLRB*, 305 U.S. 197, 229 (1938)). This deferential standard has been referred to as "'less than

9

a preponderance of evidence but more than a mere scintilla.'" *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002) (quoting *Jesurum v. Sec'y of Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). This standard, however, does not permit the court to substitute its own conclusions for that of the factfinder. *Id.* (citing *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

### *Discussion*

In Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). After a claimant has been found to be disabled and received benefits, in order to determine whether a disability is continuing, the ALJ follows a seven-step sequential evaluation. 20 C.F.R. § 416.994. The seven steps of the evaluation are:

> (1) Whether the claimant has an impairment or combination of impairments which meets or equals the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.;
>
> (2) If not, whether there has been medical improvement;
>
> (3) If yes, whether the medical improvement is related to the claimant's ability to do work;
>
> (4) If there has been no medical improvement or the medical improvement is not related to the ability to work, whether certain exceptions apply; if not, the disability will be found to continue;

(5)  If there is medical improvement related to the ability to do work or a certain exception applies, whether all the claimant's current impairments and impact of the combination of these impairments shows significant limitation of the claimant's ability to do basic work activities; if not, the impairments are not considered severe and the claimant will no longer be considered disabled;

(6)  If the current impairments are severe, whether the claimant is currently able to do substantial gainful activity and can still do work done in the past.

(7)  If the claimant is unable to do work in the past, whether the claimant can do other work.

20 C.F.R. § 416.994(b)(5)(i)-(vii); see Reefer v. Barnhart, 326 F.3d 376, 378 n.1 (3d Cir. 2003).

In the instant case, the ALJ, among other things, found: (1) as of March 1, 2004, plaintiff did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. 416.925 and 416.926); (2) medical improvement occurred as of March 1, 2004 (20 C.F.R. 416.994(b)(1)(I)); (3) the medical improvement related to the ability to work; (4) plaintiff continued to have a severe impairment or combination of impairments: residuals of a gunshot wound to the head, including occasional memory deficits and mild visual field restrictions on the left (20 CFR 416.994(b)(5)(v)); (5) plaintiff did not have any exertional limitations and retained the ability to engage in work that avoids balancing or the use of ladders, ropes or scaffold; does not require working around unprotected heights; does not require left sided peripheral visual acuity; and is limited to simple routine tasks and simple work related decisions; (6) plaintiff had no relevant past work; and (7) considering plaintiff's age, education, work experiences, and residual functional capacity based on the impairments present as of March 1, 2004, plaintiff was able to perform a significant number of jobs in the national economy (20 C.F.R. 416.960(c) and

416.966). Plaintiff's disability ended as of March 1, 2004 (20 C.F.R. 416.994(b)(5)(vii)). (R. at 14-19.)

Plaintiff raises five arguments with respect to the decision of the ALJ: first, that the ALJ erred in his determination that plaintiff's testimony concerning his impairments and their impact on his ability to work were not credible; second, that the ALJ failed to evaluate properly the opinions of plaintiff's treating and examining medical sources; third, that the ALJ's failure to consider properly the severity of plaintiff's medical condition impaired his analysis; fourth, that the ALJ erred in the characterization of plaintiff's residual functional capacity; and fifth, that the ALJ erred in his determination that there was medical improvement related to plaintiff's ability to work. Only the second argument will be addressed.

**The ALJ failed to evaluate properly the opinion of plaintiff's treating medical sources by not addressing the opinion of plaintiff's primary care physician and explaining the weight to be given to that opinion.**

Plaintiff argues that the ALJ and the Appeals Council failed to evaluate properly the evidence of plaintiff's treating medical source because there is no evidence in the record that the ALJ considered Dr. McGaughran's opinions. (Pl.'s Br. 13-16.) In Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), the court of appeals stated "that there is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." Cotter, 642 F.2d at 706. An explanation is important in the ALJ's decision because "[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Id. at 705.

In the instant case, the ALJ did not mention plaintiff's primary care physician's medical opinion in his decision. The ALJ should have explained why Dr. McGaughran's opinion was rejected. See Reefer, 326 F.3d at 381 (an administrative law judge must "explain why he chose to credit one medical report over another")(citing Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001)). The record shows that Dr. McGaughran completed an Employability Assessment Form for the Pennsylvania Department of Public Welfare, which the ALJ disregarded. "[A]n ALJ 'may not reject [a physician's findings] unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.'" Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing Kent v. Schweiker, 710 F.2d 110, 115 n. 5 (3d Cir. 1983)). The ALJ in this case based his decision on plaintiff's testimony and the medical opinions of Drs. Rastogi, O'Roark, and Last.

The medical opinions of Drs. Rastogi, O'Roark, and Last[11] all support the ALJ's finding of no disability in plaintiff's case. Dr. Rastogi opined that plaintiff had no limitations in the ability to sit, walk, lift, carry, stand, push, pull or perform postural maneuvers. (R. at 366-67.) Dr. O'Roark diagnosed atypical chest pain in plaintiff (R. at 399) and opined that no further cardiac testing was required. (R. at 397.) His opinion was based on a normal electrocardiogram (R. at 396-97) and normal chest x-ray. (R. at 401.) When Dr. Last examined plaintiff, he determined that plaintiff had moderate limitations in decision making and performing detailed tasks, no limitations in social functioning, and slight limitations in performing simple, routine, and

---

[11]Dr. Last, however, reported plaintiff had a GAF score of 35 which the ALJ did not credit. The ALJ found that score was not supported by "the summary of the examination." (R. at 17.)

13

repetitive tasks. (R. at 370.) Dr. McGaughran, on the other hand, opined that plaintiff was permanently disabled due to spinal cord injury with partial quadriplegia and a secondary diagnosis of chronic neck pain, low back pain and tinnitus based on a physical examination and clinical history. (R. at 443.)

In *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999), the court of appeals commented that the ALJ could choose which evidence to credit. The general rule regarding reports of a treating physician is that "[they] should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer*, 186 F.3d at 429 (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). If the ALJ finds that a treating source medical opinion is not well supported by medically acceptable techniques or is inconsistent with other substantial evidence, then "that opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." SSR 96-2P, 1996 WL 374188 (1996). If there was a conflict of evidence, the ALJ "cannot reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)). The United States Court of Appeals for the Third Circuit has reaffirmed the principle that where a treating physician's report conflicts with a consulting physician's, "the ALJ must explain on the record the reasons for rejecting the opinion of the treating physician." Allen v. Bowen, 881 F.2d 37 at 41 (3d Cir. 1989) (citing Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986)).

Defendant argues that Dr. McGaughran's opinion is not entitled to controlling or significant weight because the treating source opinion was on an issue reserved to the Commissioner. (Def.'s Br. 13) It is true that treating source opinions on issues reserved to the

14

Commissioner are not entitled to controlling weight or special significance because to give those opinions such weight would be an abdication of the Commissioner's responsibility. SSR 96-5P, 1996 WL 374183, at *4 ((July 2, 1996). Dr. McGaughran's opinion, however, was not mentioned at all in the ALJ's hearing decision, and "opinions from *any* medical source on issues reserved to the Commissioner must never be ignored." Id. (emphasis added). In considering Dr. McGaughran's opinion, the ALJ does not need to credit the disability determination because the "ultimate disability determination is reserved for the ALJ and a treating physician's opinion on that topic is not entitled to any special significance." Schweighauser v. Barnhart, 2006 WL 3354448 (E.D.Pa. 2006) (citing 20 C.F.R. §§ 404.1527(e)(1)). The ALJ, however, should consider the physician's opinions of the symptoms because there is an expectation that "the ALJ, as the factfinder, [will] consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law." Fargnoli v. Massanari, 247 F.3d 34 at 42. The ALJ should have addressed Dr. McGaughran's opinion in the hearing decision and explained why he chose to reject or ignore it.

## *Conclusion*

The failure of the ALJ to explain why he did not credit the symptoms or diagnosis of Dr. McGaughran warrants a remand for the ALJ to provide his reasons for not crediting those opinions. Cotter, 642 F.2d at 707. The ALJ may want to consider having plaintiff provide medical records from Dr. McGaughran because "medical evidence, especially a longitudinal medical record, can be extremely valuable in the adjudicator's evaluation of an individual's

15

statements about pain or other symptoms." SSR 96-7P, 1996 WL 374186, at*6 (July 2, 1996). The ALJ may also want to expand the record to discuss the side effects of plaintiff's medications. The credibility determination may change in light of other medical records provided by Dr. McGaughran. The other four issues raised by plaintiff will not be discussed because the consideration of Dr. McGaughran's opinion may affect how the ALJ will determine those matters on remand. In reviewing the ALJ's decision, it would be improper for the court "to speculate as to the administrative law judge's reasoning process, and the case, therefore, must be returned to the Secretary for a rehearing." Schaaf v. Matthews, 574 F.2d 157, 160 (3d Cir. 1978). This case must be remanded for the ALJ to evaluate the opinions of plaintiff's treating physician and explain why the opinions should be or not be credited. The ALJ may also consider developing the record to consider Dr. McGaughran's medical records about plaintiff's treatment.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: March 11, 2009